Gary Phelan (CT 03670)
Steven Sheinberg (CT 26727)
Outten & Golden LLP
Four Landmark Square, Suite 201
Stamford, CT 06901
(203) 363-7888
Fax: (203) 363-0333

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
-------------------------------------------------------x

**SKYE DENT**                                                    **Civil Action No.**

                **Plaintiff,**

    -   **against -**

**UNIVERSITY OF CONNECTICUT**                                   **July 11, 2005**

                **Defendant.**

-------------------------------------------------------x

## PLAINTIFF'S COMPLAINT

As and for her Complaint in the above-captioned action, plaintiff, Skye

Dent, by and through her attorneys, Outten & Golden LLP, alleges and states as

follows:

### NATURE OF THE ACTION

1.    The plaintiff, Skye Dent, brings this action to recover damages caused by the

defendant, University of Connecticut, for violations of her rights under Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

2.    Ms. Dent also has pendant state law claims against the defendants for violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. 46a-60, ("CFEPA").

## JURISDICTION AND VENUE

3.    This court has jurisdiction pursuant to 42 U.S.C. § 12201 et. seq. and 28 U.S.C. §§ 1331, 1343.

4.    This court has supplemental jurisdiction over plaintiff's related claims arising under state and local laws pursuant to 28 U.S.C. § 1367(a).

5.    Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b) as this action arose, in substantial part, within the District of Connecticut, where the unlawful employment practices alleged herein occurred and where many of the records pertinent thereto are maintained.

6.    All conditions precedents have been met.  The plaintiff timely filed claims with the Equal Employment Opportunity Commission ("EEOC") and the Connecticut Commission on Human Rights and Opportunities ("CHRO").  Ms. Dent received a Release of Jurisdiction letter from the Connecticut Commission on Human Rights and Opportunities on April 12, 2005.

7.    This complaint has been filed within 90 days of the date that the plaintiff received a release of jurisdiction.

## PARTIES

8.    Skye Dent resides in Storrs, CT 06268.

9.    The University of Connecticut ("UConn") is located in Storrs, CT 02629.  At all times relevant to this complaint, UConn employed more than 15 employees.

2

## FACTUAL ALLEGATIONS

*The Position*

10.     Ms. Dent began working for UConn on October 26, 2003.  Ms. Dent was hired
        as a media relations specialist in the University Communications/Media
        Relations Department.

11.     Ms. Dent's job responsibilities were to help enhance the image of the university
        by persuading the media to write or produce positive stories about UConn
        events, research, professors, deans and other employees.

12.     Ms. Dent was well credentialed and qualified for the position she held.  Ms. Dent
        has a BA from Brown University, an MA in journalism from one of the top three
        journalism graduate schools in the country, was at one point the youngest
        editorial writer of a daily newspaper in the country, has written for top media
        such as CBS Evening News and The Boston Globe, and was featured in an hour-
        long network special on writers with integrity.

*Working Conditions*

13.     During the ten (10) months Ms. Dent worked at UConn, Ms. Dent was required
        to put in many overtime hours.  Ms. Dent's assigned hours were 8:30 a.m. to
        4:30 p.m.  For the first six months, Ms. Dent came in at 7:00 a.m. and worked
        until 8:00 or 9:00 p.m. on weekdays and a number of hours on weekends.  To
        fulfill the assignments given to her by her supervisor, Media Relations Manager
        David A. Bauman, Ms. Dent was required to work nights and weekends when
        there was a campus event.  Mr. Bauman complimented Ms. Dent on this.

3

14. Whenever Ms. Dent told Mr. Bauman that there was too much work to do, he would say "That's the nature of the job." Whenever Ms. Dent asked for "comp" time, Mr. Bauman say "No, that's the nature of the job," and refused to allow her to record those hours on her time card.

15. On July 6, 2004, the so-called "Stinky Plant" story broke. This story featured a giant exotic plant that was blooming for the first time in over sixty years in the UConn greenhouse. This story was supposed to be another media specialist's (Rich Veilluex's) responsibility to cover. Veilluex was on vacation, so Mr. Bauman was handling it. Even though Ms. Dent came into work at 7 am, Mr. Bauman told her to stay at the greenhouse until the last media leaves after the late night news. Mr. Bauman went home at 4:30 p.m. The local NBC Affiliate, NBC 30, planned on staying all night in hopes that it completely bloomed before the 11 o'clock news. They left at 11:15 p.m. and Ms. Dent left shortly thereafter. Ms. Dent ended working a sixteen-hour day without overtime.

*Good Job Performance; Poor Reviews*

16. By objective measures, Ms. Dent was doing extremely well at her job.

17. The success of a media relations specialist can be measured by the number of media "hits" obtained. At this time, there were three media relations people to cover all of UConn.

18. Ms. Dent received a greater number of "hits" than other media relations specialists. Ms. Dent was continuously scoring "hits" for the university in

4

regional and national media sources for all of the departments Ms. Dent covered.
She was scoring three times as many hits as David Bauman.

19. Ms. Dent was very successful at her job. Evaluations of Ms. Dent recognized
and applauded Ms. Dent's productivity, work ethic, and creativity. Many
professors and deans have written her and thanked her for the media coverage
and journalism interviews Ms. Dent produced for their departments.

20. The success of a media relations specialist can also be measured by the number
of good relationships that she has with important journalists and the number of
interviews she arranges with these journalists for UConn. Skye Dent brought
with her to UConn longstanding national media relationships such as Lonnie
Isabel, national news editor at Newsday; Greg Moore, Managing Editor of The
Denver Post; and Janet Clayton, Senior Editor of the Los Angeles Times.
During her nearly eleven months at UConn, she developed longstanding
relationships with Stan Simpson, columnist at the Hartford Courant; Carolyn
Lumsden, editor of the Hartford Courant; Maria Garriga, business and education
reporter at the New Haven Register; John Byrne, editor and publisher of Fast
Company; Gail Collins, editor of the New York Times, Rick Hancock at WTIC-
TV, and Campbell Brown of the NBC Today Show.

21. In February 2004, Dr. Willena Price, head of the African American Cultural
Center, called Mr. Bauman to complain about Ms. Dent. While she was initially
upset, because Ms. Dent obtained a great deal of media coverage for the event,
Dr. Price ended up liking the results of Ms. Dent's efforts so much that she
thanked her in the taped introduction to the event in front of the entire audience.

Mr. Bauman later complained in Ms. Dent's six-month evaluation that Ms. Dent had a "marred relationship" with her department.

22. During the last week of March, 2004, Professor of English Glen McLeod called to complain because Ms. Dent was not doing calendar items on his upcoming Wallace Stevens conference. Mr. Bauman had told Ms. Dent that her job did not include the more mundane task of entering calendar items. However, when Dr. McLeod called him about it, Mr. Bauman agreed to have it done, damaging the credibility of Ms. Dent in the eyes of Dr. McLeod. Mr. Bauman then told Ms. Dent that he would have an intern do it. Because Mr. Bauman never arranged for an intern to do it, Ms. Dent had to create a calendar intake information form and take the time to send it out to over a dozen calendar editors. Ms. Dent eventually ended up getting extensive media coverage for Dr. McLeod's event. However, in the six-month evaluation, Mr. Bauman did not acknowledge this or the fact that, after Dr. McLeod's initial call of compliant, that he and Ms. Dent had successfully worked together. Instead, Mr. Bauman wrote in Ms. Dent's six-month evaluation that Ms. Dent had a "marred" relationship with the Department of English.

23. On Sunday, March 28, 2004, the Hartford Courant published a front-page opinion piece that Ms. Dent had written during her free time. The commentary was on the joys Ms. Dent received while doing volunteer work for the Los Angeles Police Department Crisis Response Team. Everyone else in the office congratulated her and said how much it helped UConn's image. Mr. Bauman complained that Ms. Dent should have checked with him first before writing it.

24.   During Ms. Dent's first six months of employment, Mr. Bauman repeatedly made comments such as, "The first 12 months, it's just between you and me, Skye. I'm the only one who can fire you." Or "It's just between you and me, Skye. There's no one else you can turn to." Because Mr. Bauman refused to meet with Ms. Dent anywhere other than in his isolated corner office, no one else was present when he made these threats.

25.   In April 2004, Ms. Dent complained to Mr. Scott Brohinsky, Director of Communications and Mr. Bauman's supervisor, that Mr. Bauman had made several threats about her job.

26.   On April 30, 2004, Ms. Dent asked Mr. Bauman if he wanted to give her a six-month evaluation before Ms. Dent left work for vacation.  It was due April 27, 2004.  He said he was not done yet, but not to worry and added, "It's all great. You've done a great job." He also gave her a "thumbs up" sign.

27.   Ms. Dent received her six-month evaluation from Mr. Bauman in mid-May.  As noted, Mr. Bauman stated that Ms. Dent had "marred" relationships with three departments even though she had a healthy working relationship with those departments.  He also commented that Ms. Dent thought she "knew it all" and was unwilling to improve her craft (even thought her six-month report of activities and achievements later clearly illustrated that Ms. Dent had taken numerous professional development classes and meetings from which Ms. Dent had benefited).

28.   On July 1, 2004, Ms. Dent obtained some media coverage that no one ever had at UConn: a full page spread on the School of Business in Biz Ed magazine, a

national magazine that most business journalists and business professors subscribe to. Curt Hunter, Dean of the School of Business ordered 1,000 copies and a PDF and sent an e-mail to Scott Brohinsky and David Bauman telling them that the media attention Ms. Dent had obtained was going to help him tremendously in terms of garnering endowment money and raising the School of Business's image.

29.     On July 22, 2004, Ms. Dent met with Mr. Bauman and Mr. Brohinsky. Ms. Dent told Mr. Brohinsky that the threats from Mr. Bauman had not stopped. Ms. Dent told him about the sneering comments that Mr. Bauman often made. Mr. Bauman admitted that he made sneering comments to Ms. Dent. Ms. Dent came in with proof that statements Mr. Bauman had made in the June evaluation were false. Mr. Brohinsky said "it's clear that Skye is doing an outstanding job her and wants to succeed. The only problem seems between the two of you." Mr. Bauman left the room angry.

*Termination*

30.     Mr. Bauman's treatment of Ms. Dent caused her to seek psychiatric help and be prescribed antidepressants. In late July 2003, Ms. Dent started meeting for talk therapy with Dr. Leslie Strong and also with a psychiatrist, Dr. Gerard Selzer. Both doctors felt that Ms. Dent's condition was due to the situation and stress caused by David Bauman. Dr. Selzer gave her a prescription for Paxil CR.

31.     On September 7, 2004, Dr. Leslie Strong faxed over a request to the Human Resources Department to put Ms. Dent on medical leave. This request was faxed around noon. The request pinpointed how Ms. Dent had been under his

care and that he felt that Ms. Dent should have a leave of absence.  Ms. Dent
notified Mr. Bauman and Mr. Brohinsky of this request during a meeting they
had that same day.  Both Mr. Bauman and Mr. Brohinsky ignored Dr. Strong's
request.

32.    On September 7, 2004, Ms. Dent met with Peggy Becket-Rinker, union
representative; Peter Moranis, the shop steward for Ms. Dent's building; Mr.
Brohinsky, director of communications; Mr. Bauman, media relations manager,
and a human resource associate.  Mr. Brohinsky told Ms. Dent that she was
terminated because of communication problems within the department.  At this
time, Mr. Bauman and Ms. Dent were the only employees in the Media Relations
department.    The UConn Human Resources Associate refused to allow Ms.
Dent to record the meeting and notes taken during the meeting which were
promised to Ms. Dent, were never delivered despite many requests for them.

33.    Ms. Dent received a letter of termination from Mr. Brohinsky with an attached
evaluation from Mr. Bauman.  Mr. Bauman wrote that he terminated her because
Ms. Dent had bad relationships inside and outside the department of media
relations.  He said that Ms. Dent had problems maintaining long-term
relationships and had caused such disruptions in the office that it had negatively
affected the work level of media relations.

34.    On September 15, 2004, after she was terminated, Richard Veilleux,
Communication Department staff member, emailed Ms. Dent a letter of support.
He wrote, "I worked with Skye Dent throughout her 10 months in University
Communications, during which time I enjoyed her company and was regularly

amazed by her ability to place stories focused on UConn professors in media not only across the country but throughout the world.  Never in my 19 years at the University, have I seen so many media 'hits.'' He also wrote, "Although I'm told the reason for Skye's termination was her demeanor with faculty and staff, I'm compelled to say I had no conflicts with her whatsoever during her tenure in Ms. Dent's office."

35.  On September, 17, 2004, Dr. Richard Wilson, director of the UConn Human Rights Institute, sent a letter to Mr. Bauman and Mr. Brohinsky which stated, "I understand from other university departments that one of the reasons given for terminating her employment is that Ms. Dent did not develop good relations in the university community, but that was certainly not the case with us."  In the letter, he also complained that by abruptly terminating Ms. Dent without consulting the professors on her beat, that Mr. Bauman had jeopardized the success of his upcoming conference and other projects requiring media attention.

36.  On September 21, 2004, Dr. David G. Woods, dean of the School of Fine Arts, wrote, "During the past few months, Skye has been a significant force in increasing the visibility of the School of Fine Arts."

37.  On September 27, 2004, Curt Hunter, dean of the School of Business, wrote an email to Thomas Callahan stating, "Skye's performance in dealing with the School of Business has been at an exceptional level.  The consensus among members of our leadership team (Deans, key faculty, and program directors) is that due to her tireless efforts, the School of Business received higher and more

significant level of media exposure over the past 10 months than it had received over the past several years."

38.   Dr. Richard Wilson, Dean David G. Woods, Dean William Curt Hunter, and many others have provided job references for Ms. Dent since she was terminated· and she continues to consult with them regarding media opportunities for their departments.

*Race Discrimination*

39.   Ms. Dent's areas of responsibility – her "beats" – included the School of Business, School of Fine Arts, African National Congress UConn Initiative, all of the minority Cultural Centers, African American Institute, Office of Multiculturalism, The Human Rights Institute, and many other departments.

40.   Ms. Dent told Mr. Bauman that she thought it reflected "something from a previous era" to put the one black media relations specialist in charge of providing media relations for all of the departments that dealt with people of color and human rights issues.  She explained that it gave the impression of "ghetto-izing" those beats and that they were only of interest to a black media relations specialist and not the entire university.  Mr. Bauman said that those were the beats Ms. Dent's predecessor had.

41.   Janice Palmer, media relations specialist, later told Ms. Dent that the beats were reshuffled by Mr. Bauman just before Ms. Dent arrived.  For example, even though David Bauman had the School of Business as his beat, he dropped it shortly after it was announced that William Curt Hunter, an African American,

was assuming the deanship of that school.   UConn itself later confirmed that David Bauman had indeed reshuffled the beat.

42.   On December 11, 2003, Mr. Bauman told Ms. Dent that she should market Dean Hunter as a black dean.  For example, he wanted Ms. Dent to make sure the media knew that Dean Hunter was black.  Ms. Dent told Mr. Bauman that she thought this was insulting to Dean Hunter, and that he had many impressive credentials.  Prior to coming to run the School of Business, Dean Hunter had been a senior policy maker for the Federal Reserve, first in Atlanta and then in Chicago.  He had also been a consultant to many European emerging nations. He was about to be appointed to the board of directors of Xerox.  Ms. Dent felt that a Caucasian with these kinds of credentials would not be marketed as a "white" Dean of The School of Business.  However, Mr. Bauman said Ms. Dent had to tell Dean Hunter that this was something he wanted.

43.   Mr. Bauman's directing Ms. Dent to market Dean Hunter's race made her concerned that she was, in turn, being marketed by Mr. Bauman as a "black" media relations specialist, making it appear as if she was hired because she was black instead of due to her numerous achievements, her impressive media contacts, and her successful work history.

44.   Mr. Bauman had told others that Ms. Dent's predecessor, Allison Thompson, obtained her job there because she was black.

45.   On April 13, 2004, Ms. Dent obtained an interview on Voice of America for UNESCO Chair, ANC-UConn head, and history professor Dr.Amii Omara-Otunnu.  This was around the ten-year anniversary of the end of apartheid.

Professor Omara-Otunnu had worked against apartheid in Africa, had barely escaped with his life in the 1960's, and was close friends with many in the ANC and many in the current South African government. Scott Brohinsky had told Ms. Dent that when she arrived that the ANC-UConn initiative was important, considered one of the University's "Centers of Excellence." Despite the prestige and recognition duly accorded to Dr. Omara-Otunnu, Mr. Bauman was consistently telling Ms. Dent to give up on media efforts regarding Mr. Omara-Otunnu. Mr. Bauman told Ms. Dent that he thought that Professor Omara-Otunnu used his race and his activism background to "guilt trip" the university.

46.   Mr. David Bauman complained to Fiscal Manager Michelle Parent that he thought that a picture hanging in Ms. Dent's office of her aboard the historic slave ship Amistad was offensive.

47.   Although Ms. Dent is an active member of the National Association of Black Journalists and has organized panel discussions at their yearly conference, David Bauman refused to let her take two days off to attend this yearly conference. Over 3,000 journalists nationwide attend and it would have been beneficial to her position at UConn. When she asked if she could make the request directly to Scott Brohinsky, he told her that she could not.

48.   The Office of University Communications is predominantly made up of Caucasian employees.

49.   At the time of Ms. Dent's termination, there were twenty-eight employees (28) working in the main office of communications (exclusive of the Special Events or Visitor Center divisions). Out of these twenty-eight employees, only (4) of

13

them were black and two of those four were on first year probationary status.
Not one black female held a supervisory position.

50.     In the past two years, the Office of University Communications has lost two
        black females, Skye Dent and Allison Thompson, both of whom were Media
        Relations Specialists working directly under David Bauman.

51.     There is currently only one black female employee left in the communications
        office and she works in marketing.  She has worked there for less than a year and
        a half.  She is seeking other employment.

52.     The Office of University Communications has not offered positions of authority
        to black employees, especially not to black female employee.

*Gender Discrimination*

53.     Mr. Bauman treated women in a demeaning manner and he did not treat men this
        way.

54.     His demeaning attitude toward Ms. Dent included constantly threatening her job.
        As discussed above, Baumann repeatedly said demeaning things to Ms. Dent,
        including, "The first 12 months, it's just between you and me, Skye. I'm the only
        one who can fire you," "It's just between you and me, Skye.  There's no one else
        you can turn to," and called Ms. Dent a "know it all."

55.     Mr. Bauman also berated female employees.  On October 30, Catherine Dubuc,
        office assistant, had a question about Ms. Dent's time card and came into Mr.
        Bauman's office to talk to Ms. Dent while she was there.  Before she finished
        asking her question, Mr. Bauman started yelling at her and making a motion with

14

his hands to indicate that she should be quiet. She raised her voice and said that she was simply asking a question and should not be yelled at. Mr. Bauman yelled back saying he "didn't want to hear it."

56. Ms. Dubuc later said to Ms. Dent that she had also complained to Scott Brohinsky, Director of Communications, that day about Mr. Bauman yelling at her and many times in the past.

57. On June 15, 2004, Janice E. Palmer, the other media relation's associate working under Mr. Bauman, resigned, effective July 8, 2004. Ms. Palmer had been looking for a job since Ms. Dent first arrived. Ms. Palmer said that Mr. Bauman repeatedly took credit for her work.

58. During a fourteen month period, all three female media relations specialists, Janice Palmer, Allison Thompson, and Skye Dent, either quit or were terminated under Mr. Bauman's management and Mr. Bauman's supervision.

59. During the last full week of August, 2004, Ms. Dent spoke with Karen Grava, a media communications director whom Mr. Bauman had repeatedly told Ms. Dent not to trust.

60. Ms. Grava said that she and other women had complained to Mr. Brohinsky about Mr. Bauman's treatment in the past. Ms. Garva said that Mr. Brohinsky basically treated them as if they were "bitchy, whiny women" and dismissed their complaints. She said that the only problem Mr. Bauman probably had with Ms. Dent was that she was not "humble enough" and didn't have the "same thing between her legs that he did."

61.  The following women within the Office of University Communications
     complained to co-workers and/or Mr. Brohinksy about Mr. Bauman's
     unacceptable behavior towards them:

     a.  Cat Dubuc, Secretary II

     b.  Karen Grava, Media Communications Manager

     c.  Janice Palmer, Media Relations Specialist

     d.  Allison Thompson, Media Relations Specialist

     e.  Elizabeth Omara-Otunnu, Advance Editor

     f.  Skye Dent, Media Relations Specialist

62.  The Office of University Communications is numerically gender diverse but it is
     controlled by white males.

63.  At the time of Ms. Dent's termination, there were twenty-eight (28) employees
     in the Office of University Communications - fourteen males, and fourteen
     females. Out of the fourteen male employees, four males (4) held directorship
     positions and three males (3) held managerial positions.  These figures do not
     include the Special Events of Visitor Center divisions.

64.  At the same time, out of the fourteen female employees, not one woman held a
     directorship position, and only one woman, Karen Grava, held a managerial
     position.  However, Karen Grava had once held Scott Brohinsky's position as
     head of all of communications.  She has since had her responsibilities and
     authority drastically reduced.

65.  Women are underrepresented in all senior management positions at UConn.

16

*Reporting Discrimination*

66.  Ms. Dent attempted to report the discrimination she faced.

67.  As described above, she met with Mr. Bauman's supervisor on several
     occasions.

68.  After Ms. Dent received her negative six-month evaluation, Ms. Dent contacted
     Peggy Beckett-Rinker of the UCPEA Union because Ms. Dent and several
     colleagues felt the evaluation was unfair.  Ms. Beckett Rinker tried to meet with
     Mr. Bauman about Ms. Dent's evaluation and he refused.  She said afterwards
     that it was clear from the telephone conversation that he had no respect for
     women. Ms. Dent later learned that Mr. Bauman is the only manager that has
     ever refused to meet with the union when asked.

69.  Prior to her departure, Allison Thompson had voiced complaints about David
     Bauman to Damon Williams at the UConn Office of Multicultural Affairs,
     Sociology professor Michelle Williams, and political science professor Dr.
     Evelyn Simien.

70.  On June 4, 2004, Ms. Dent sought to report the discriminatory treatment she had
     received from Mr. Bauman by meeting with Dana McGee of the Office of
     Diversity and Equity.

71.  Ms. McGee and the Office of Diversity and Equity are responsible for
     investigating complaints of discrimination and harassment.

72.  Ms. Dent was told by the UConn Office of Diversity and Equity that filing a
     complaint may lead to animosity in the communications department.   This led
     Ms. Dent to fear retaliation.

73.   The Office of Diversity and Equity failed to disclose that not only are they
      responsible for investigating employee claims of discrimination and harassment,
      but also they are responsible for defending the UConn against claims of
      discrimination in legal proceedings.  In fact, when Ms. Dent filed a complaint
      before the Connecticut Commission on Human Rights and Opportunities, Eileen
      Duggan, Assistant Director of the Office of Diversity and Equity, was named as
      Attorney General Designee and represented the Defendant against the Plaintiff
      before the Connecticut Commission on Human Rights and Opportunities.  Her
      representation of UConn included conducting an investigation and drafting
      responsive papers.

*Retaliation and Discrimination*

74.   After Ms. Dent reported that she was the victim of discrimination, Mr.
      Bauman wrote performance evaluations that were progressively worse despite
      her continued high performance, recorded successes, and the receipt of an ever
      increasing number of praise and support from UConn colleagues.  These
      evaluations included the June, 2004 evaluation that Mr. Bauman presented to
      Miss Dent two weeks late in July, 2004 and the July, 2004 evaluation that Mr.
      Bauman handed in 23 days late on August 23, 2004.  Human Resources requires
      that managers substantiate any negative evaluation criticism. Mr. Bauman
      violated university policy by and did not provide any proof for his complaints.

75.   Ms. Dent suffered and worked in a hostile work environment due to her sex.

76.   Ms. Dent suffered adverse terms and conditions of employment due to her sex.

77. Even after Ms. Dent contacted the Office of Diversity and Equity to seek redress and prevent further harm, UConn failed to remedy past instances of sexual harassment and racism, to prevent future harassing or racist behavior, and to prevent Ms. Dent's unlawful termination.

78. Given the conflict of interest in the Office of Diversity and Equity, UConn failed to provide a meaningful mechanism for reporting unlawful employment behavior by supervisors.

79. The Defendant's reasons for terminating Ms. Dent's employment were pretextual and were intended to disguise the fact that Ms. Dent was being terminated due to Ms. Dent's gender.

80. The Defendant's reasons for terminating Ms. Dent's employment were pretextual and were intended to disguise the fact that Ms. Dent was being terminated due to Ms. Dent's race.

81. Ms. Dent was subjected to adverse terms and conditions of employment, including termination, because of her gender.

82. Ms. Dent was subjected to adverse terms and conditions of employment, including termination, because of her race.

83. Ms. Dent was retaliated against for complaining about the discriminatory treatment she received from her supervisor.

84. Because of the acts of defendants, the Plaintiff has suffered the loss of back pay, front pay, fringe benefits, personal humiliation, emotional anguish, and suffered extensive damage to her professional reputation.

## COUNT I

## Violation of Title VII of the Civil Rights Act of 1964

## 42 U.S.C. § 2000e et seq.

85.  The allegations contained in all preceding paragraphs are hereby repeated and realleged as if fully set forth herein.

86.  The Plaintiff is a woman.

87.  The Plaintiff was well qualified for the position from which she was terminated.

88.  The Defendant intentionally discriminated against Plaintiff in the terms and conditions of her employment under circumstances that give rise to an inference of discrimination on the basis of gender and retaliated against her in violation of Title VII.

89.  Plaintiff has been damaged as a result of the Defendant's discrimination.

## COUNT II

## Violation of Title VII of the Civil Rights Act of 1964

## 42 U.S.C. § 2000e et seq.

90.  The allegations contained in all preceding paragraphs are hereby repeated and realleged as if fully set forth herein.

91.  The Plaintiff is an African-American.

92.  The Plaintiff was well qualified for the position from which she was terminated.

93.  The Defendant intentionally discriminated against Plaintiff in the terms and conditions of her employment under circumstances that give rise to an inference

of discrimination on the basis of race and retaliated against her in violation of Title VII.

94.   Plaintiff has been damaged as a result of the Defendant's discrimination.

## COUNT III

### Violation of the Connecticut Fair Employment Practices Act

### Conn. Gen. Stat. 46a-60

95.   The allegations contained in all preceding paragraphs are hereby repeated and realleged as if fully set forth herein.

96.   The Plaintiff is a woman.

97.   The Plaintiff was well qualified for the position from which she was terminated.

98.   The Defendant intentionally discriminated against Plaintiff in the terms and conditions of her employment under circumstances that give rise to an inference of discrimination on the basis of gender and retaliated against her in violation of Connecticut Fair Employment Practices Act

99.   Plaintiff has been damaged as a result of the Defendant's discrimination.

## COUNT IV

### Violation of the Connecticut Fair Employment Practices Act

### Conn. Gen. Stat. 46a-60

100.   The allegations contained in all preceding paragraphs are hereby repeated and realleged as if fully set forth herein.

101.   The Plaintiff is an African-American.

102.   The Plaintiff was well qualified for the position from which she was terminated.

103.    The Defendant intentionally discriminated against Plaintiff in the terms and
        conditions of her employment under circumstances that give rise to an inference
        of discrimination on the basis of race and retaliated against her in violation of
        Connecticut Fair Employment Practices Act.

104.    Plaintiff has been damaged as a result of the Defendant's discrimination.

## COUNT V

### Violation of Title VII of the Civil Rights Act of 1964

### 42 U.S.C. § 2000e et seq. - Retaliation

105.    The allegations contained in all preceding paragraphs are hereby repeated and
        realleged as if fully set forth herein.

106.    The plaintiff engaged in a protected activity under Title VII in that she
        complained about the racial and gender discrimination she faced.

107.    As a direct consequence of that activity, she was subject to an adverse
        employment action, namely, negative performance reviews and termination.

108.    Plaintiff has been damaged as a result of the Defendant's retaliation.

## COUNT VI

### Violation of the Connecticut Fair Employment Practices Act

### Conn. Gen. Stat. 46a-60(a)(4) - Retaliation

109.    The allegations contained in all preceding paragraphs are hereby repeated and
        realleged as if fully set forth herein.

110. The plaintiff engaged in a protected activity under Connecticut Fair Employment Practices Act in that she complained about racial and gender discrimination by the defendant.

111. The Defendant was aware of this complaint as it was filed with the Defendant's Office of Diversity and Equity.

112. As a direct consequence of that activity, she was subject to an adverse employment action, namely, negative performance reviews and termination.

113. Plaintiff has been damaged as a result of the Defendant's retaliation.

**WHEREFORE**, Plaintiff respectfully requests that upon trial this Court enter judgment:

A. Declaring that Defendants' policies and practices violated Title VII and CFEPA

B. Permanently enjoining the Defendant (and their officers, agents, and successors) from engaging in actions or practices that discriminate against any employees or job applicants because of their race or gender or participation in this lawsuit;

C. Directing the Defendant to make Plaintiff whole by providing her with back pay, reinstatement or front pay in lieu thereof, and reimbursement for lost Social Security and other employment related benefits, in an amount to be determined at trial;

D. Directing the Defendant to pay Plaintiff compensatory damages for the emotional distress, pain, and suffering caused to her by the discrimination, harassment, humiliation and retaliation she suffered, in an amount to be determined at trial;

E. Directing Defendants to pay Plaintiff punitive damages sufficient to punish and deter continuation of Defendants' unlawful employment practices, in an amount to be determined at trial;

F. Awarding Plaintiff reasonable attorney's fees and costs in an amount to be determined at trial; and

G. Granting such additional relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by a jury.

Dated: Stamford, Connecticut
   July 11, 2005

       Respectfully submitted,

       OUTTEN & GOLDEN LLP

     By: _____
       Gary Phelan (CT 03670)
       Steven Sheinberg (CT 26727)
       Outten & Golden LLP
       Four Landmark Square, Suite 201
       Stamford, CT 06901
       (203) 363-7888
       Fax: (203) 363-0333